**HELVERING, Com'r of Internal Revenue, v. SECURITY SAVINGS & COMMERCIAL BANK.**

No. 3674.

Circuit Court of Appeals, Fourth Circuit.

Oct. 2, 1934.

S. Dee Hanson, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

W. W. Spalding, of Washington, D. C. (Albert L. Clothier, of New York City, and Mason, Spalding & McAtee, of Washington, D. C., on the brief), for respondent.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

NORTHCOTT, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals (29 B. T. A. 176), involving federal income taxes for the years 1927 and 1928, in the amount of $4,450.79.

The respondent, hereinafter referred to as the Bank, is a corporation, incorporated under the laws of West Virginia, and during the year 1927 was engaged in the banking business in Washington, D. C. On June 14, 1927, the president of the Bank obtained an option from the then president of the Central Savings Bank, a District of Columbia corporation, engaged in the banking business in Washington, for the acquisition by purchase of 1,001 of the 2,000 shares of the capital stock of the Central Savings Bank at a price of $140 per share. At a special meeting of the board of directors of the Bank, held June 24, 1927, the board voted to take over the option for the Bank and took steps to apply to the Comptroller of the Currency for authority to establish a branch bank at the place of business then used by the Central Savings Bank and to take over all the assets and liabilities of the Central Savings Bank for the purpose of operating said branch bank. The Bank's vice president was authorized to vote the stock of the Central Savings Bank for the purpose of liquidating that bank and canceling its charter. Authority to establish and operate the branch bank was granted.

On June 25, 1927, a contract was entered into between the Bank and certain stockholders of the Central Savings Bank for the purchase of 1,701 shares of the capital stock of the last-named bank at the same price of $140 per share. By June 30, 1927, the Bank had acquired additional shares of the stock of the Central Savings Bank and on that date owned 1,839 shares of such stock, for all of which the price of $140 per share had been paid. By the contract of June 25, 1927, it was agreed that before making final payment for the stock, agents of the Bank might inspect the books and records of the Central Savings Bank, and such inspection was made before the purchase of the stock was completed.

At a meeting of the board of directors of the Central Savings Bank held on June 30, 1927, the then acting directors of that bank resigned and were replaced by nominees of the Bank. The president, vice president, and treasurer of the Central Savings Bank also resigned and the vacancies were filled by the election of nominees of the Bank. On the same day the Central Savings Bank, with the approval of its stockholders, entered into an agreement with the Bank by which the Central Savings Bank sold and delivered to the Bank all of its " * * * notes, ledgers and other accounts, choses in action, bills receivable, real estate and any and all other assets, real, personal and mixed of every nature, kind and character whatsoever * * *," for the sum of $250,006.07.

The statement of the Central Savings Bank at the close of business on June 30, 1927, the date of the sale, showed that that bank had savings deposits of over $600,000. At the time of the sale (June 30, 1927), there remained outstanding and not owned by the Bank 161 shares of the capital stock of the Central Savings Bank. These shares were acquired by the Bank between July 1 and October 18, 1927, at the same price as that paid for the other shares, $140 per share. On November 9, 1927, the stockholders of the Central Savings Bank directed the payment of a final liquidating dividend of $124.21 on each of the 2,000 shares of stock or a total dividend of $248,420. By this payment the Central Savings Bank divested itself of all its assets and no further distribution to stockholders was ever made by it.

Immediately after the transaction of June 30, 1927, the Bank took possession of all the assets of the Central Savings Bank and of its banking house and conducted a branch banking business at that location for a period of ten months, after which the location of the branch bank was moved. On December 28, 1927, in conformity with resolutions duly adopted by its board of directors, the Bank charged to profit and loss, on its books, the sum of $31,580, the loss claimed to have been sustained by it through the purchase and liquidation of 2,000 shares of Central Savings Bank stock.

In computing net income for the calendar year 1927 the Bank claimed as a deduction the sum of $31,580, representing the difference between the cost of the 2,000 shares of the Central Savings Bank stock, purchased at $140 per share, and the amount distributed by the Central Savings Bank as a liquidating dividend, namely, the sum of $248,420. This deduction was disallowed by the Com-

missioner of Internal Revenue, and upon petition of the Bank the Board of Tax Appeals held against the Commissioner.

The sole question presented here is whether the Bank sustained a deductible loss where it bought all of the stock of another bank, took over all the tangible and intangible assets of that bank at a price equal to the book value of its stock, which price was less than the Bank paid for the stock of the purchased bank, when the object was to obtain the business of a rival concern with a large amount of deposits and to establish a branch bank at the place of business of the purchased bank.

A survey of the transaction as a whole leads us to the conclusion that the course of events connected with the purchase of the stock and assets of the Central Savings Bank were, in effect, one transaction. The record discloses the fact that the only object the Bank had in paying a greater value for the stock of the Central Savings Bank than it was shown to be worth on the books, was the acquisition of the business, including the location of the purchased bank; that these intangible assets had a value to the purchasing bank is not to be doubted, else the transaction in itself would have been a foolish one, without excuse. That the Bank thought it was purchasing something of value in addition to the tangible assets is shown by the fact that it paid $140 per share for the 161 shares of stock it did not own on June 30, 1927, when it was definitely known that the liquidating dividend would only amount to $124.21 per share. In other words, after having purchased all the assets of the Central Savings Bank at a figure that would give to the stockholders only $124.21 for a share of stock, it continued to pay $140 a share. The sale of the assets was made by its own officers acting as officers of the Central Savings Bank and was nothing more than a formality that was gone through with for the purpose of carrying out the plan as originally conceived; the Bank knew that it would not get back in actual dividends the amount paid for the stock but unquestionably expected to get value received for the difference by the acquisition of the business and location of the purchased bank and, as it was still in possession of the business and location at the time the return was made, for the purposes of taxation, for the year 1927, there could have been, at that time, no definitely ascertained loss upon the transaction. The value of the assets tangible and intangible which the Bank acquired should be treated, for the purposes of taxation, as equal to the cost of the stock. Prairie Oil & Gas Co. v. Motter (C. C. A.) 66 F.(2d) 309.

The series of acts corporate and otherwise leading up to the purchase of the stock and of the business of the Central Savings Bank constituted only a single transaction in which the Bank purchased certain assets tangible and intangible for the price paid for the stock. The whole transaction constituted the means with which to carry out the plan and in the application of income tax laws the substance and not the form should control. S. A. MacQueen Co. v. Commissioner (C. C. A.) 67 F.(2d) 857; Prairie Oil & Gas Co. v. Motter, supra; Tulsa Tribune Co. v. Commissioner (C. C. A.) 58 F.(2d) 937; West Texas Refining & Development Co. v. Commissioner (C. C. A.) 68 F.(2d) 77.

It is not necessary to cite authority to the effect that intangible assets, while not usually carried on the books of banks, can be of great value, and it is a recognized fact that the good will of a going concern has a definite value however difficult it may be to accurately estimate that value.

The Bank purchased the stock at a certain fixed price knowing all the circumstances connected with its value and it is settled that the fair sale of stock is the best evidence of its market value. Standard Oil Co. v. Southern Pacific Co., 268 U. S. 146, 45 S. Ct. 465, 69 L. Ed. 890; Muser v. Magone, 155 U. S. 240, 15 S. Ct. 77, 39 L. Ed. 135; Tabor Mfg. Co. v. Commissioner (C. C. A.) 34 F.(2d) 140. Moreover, after the absorption of the purchased bank the Bank had everything that it had before and it had lost nothing because of the purchase made of the assets of the Central Savings Bank. Paper transactions of this kind do not of themselves prove a loss. Alpha Portland Cement Co. v. United States (C. C. A.) 261 F. 339; Gulf Oil Corp. v. Lewellyn, 248 U. S. 71, 39 S. Ct. 35, 63 L. Ed. 133.

Respondent relies upon the decision of this court in the case of Burnet v. Riggs National Bank, 57 F.(2d) 980, but that case is easily distinguishable from the instant case. In the Riggs National Bank Case, that bank, at the solicitation of the Comptroller of the Currency for a commendable purpose, took over the assets and business of the Hamilton Savings Bank. The transaction was not entered into with any hope of gain by the acquisition of the Hamilton Savings Bank but was done solely to avoid a disorganization of

the banking business in the District of Columbia. The Riggs Bank conducted the business of the purchased bank at a loss, and we properly held that such a loss as was shown to have been incurred in the transaction was a deductible loss under the income tax laws. Here no such condition existed; the Bank purchased the Central Savings Bank stock with the hope and expectation of making a profit by the transaction, and so far as the facts disclosed by the record go, no loss has been shown. While it is true, as we said in the Riggs National Bank Case, that separate corporate entities are not to be entirely ignored in considering questions of taxation, where, as here, the sale of the assets was made between two banks with identical officers and practically identical stockholders, separate corporate entities become so merged that the line of demarcation is scarcely visible.

The loss claimed was not proven and the action of the Commissioner in determining a deficiency in the income tax against the Bank was correct.

The decision of the United States Board of Tax Appeals is, accordingly, reversed.