COMMISSIONER OF INTERNAL REVE-
NUE v. ASHLAND OIL & RE-
FINING CO.

ASHLAND OIL & REFINING CO. v. COM-
MISSIONER OF INTERNAL
REVENUE.

Nos. 7541, 7542.

Circuit Court of Appeals, Sixth Circuit.

Nov. 18, 1938.

HAMILTON, Circuit Judge, dissenting.

———◆———

A. F. Prescott, of Washington, D. C. (James W. Morris, Sewall Key, and A. F. Prescott, all of Washington, D. C., on the brief), for Commissioner of Internal Revenue.

John W. Davis, of New York City, and John E. McClure, of Washington, D. C. (John W. Davis, of New York City, Weston Vernon, Jr., Robert N. Miller, and John E. McClure, all of Washington, D. C., Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Miller & Chevalier, of Washington, D. C., on the brief), for Ashland Oil & Refining Co.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

Upon the petition of the taxpayer, Swiss Oil Corporation, now merged with others under the name Ashland Oil & Refining Company, we have two principal questions to decide. The first is whether the taxpayer in 1926 by liquidating another corporation, the stock of which it wholly owned, realized gain, notwithstanding an original purpose to acquire the liquidated corporation's properties, and not its stock. The second involves the correctness of the Board of Tax Appeals' determination of cost of the stock as a base for computing depletion. Upon the Commissioner's petition, and depending upon our answer to the principal questions involved, subsidiary questions are presented relating to amortization of discount allowed on notes given for the stock affecting taxes for the years 1926 to 1930, inclusive. Issues involving an alleged estoppel and errors in procedure will become important only if we conclude that the Board was right in deciding the principal issues against the taxpayer.

The Swiss Company was in the oil producing business in Eastern Kentucky. Prior to 1925 its business was unprofitable and it determined to procure more productive properties. For several years its directors discussed the purchase of lands or leases belonging to the Union Gas & Oil Company in Kentucky. For reasons with which we are not here concerned, the Union Company refused to sell its properties, but on July 29, 1924, Combs, President of Swiss, and Thraves, a stockholder, acting for Swiss, secured an option to purchase all of the Union stock for Five Million Dollars, of which a first payment of $1,500,000 was to be made upon its exercise. By the terms of the option the Union stock was then to be placed in escrow, Union was to continue to operate the property until the net proceeds from operations should equal the sum of $1,000,000, when this amount was to be paid to the Union stockholders as a second payment. The balance of the purchase price was to be evidenced by promissory notes secured by a mortgage upon the oil and gas leases. Upon completion of the second payment and the delivery of the mortgage and notes for $2,500,000 the Union stock was to be delivered to Swiss by the escrow agent. It was agreed that the sale of the stock should not carry with it any oil, money, notes, accounts, credits or securities belonging to Union on the day of the delivery of the stock, but that they should belong to the Union stockholders in proportion to their stock holdings. Unused material and equipment on hand and in storage upon the properties were likewise reserved from the sale, with the provision that they were to be purchased by Swiss at a price not exceeding original cost. The Union stockholders were to pay all taxes and other obligations of the company incurred prior to the exercise of the option, and were to indemnify Swiss against any claims, either in tort or upon contract, that might accrue prior to the date of the initial payment.

Thereafter Thraves assigned his interest in the option to Combs, and Combs later assigned to Swiss. For a consideration, several extensions were granted by Union, the last being until January 12, 1925. Swiss made strenuous efforts to raise funds to meet the initial payment. They were unsuccessful, and finally Combs was authorized to dispose of the option on the best possible terms, and if this could not be done to allow it to lapse. Before its expiration, however, an agreement was made on behalf of Swiss with the securities firm of Pynchon & Company of New York and Chicago. By its terms. Pynchon, to whom the option was first assigned and on whose behalf it had been exercised, agreed to reconvey the option to Swiss, together with $1,750,000 in cash, in consideration of the delivery to Pynchon of $2,000,000 of Swiss three year 7% notes and Swiss capital stock of a par value of $2,000,000. Swiss was to apply $1,500,000 to the payment of the first installment upon the purchase price of the Union stock and to assume Pynchon's obligation for the balance.

The Swiss agreements with Pynchon and with Union were carried out. During 1925 the oil and gas leases were operated under Union's supervision, and out of net earnings the second payment on the purchase price of the stock, plus interest, was paid by declaring dividends on the Union stock held by the escrow agent and paying them to the Union stockholders. The last payment was made on December 30, 1925, and thereafter the notes and mortgages to secure the remaining portion of the purchase price were executed and delivered. The Union stock was delivered to Swiss by the escrow agent, and on January 2, 1926, Union was liquidated and its properties assigned to Swiss.

It is agreed that the properties of Union when taken over by Swiss had a fair value of $7,906,043.32. The Commissioner, however, in his 1926 deficiency note determined the base for the taxpayer's depletion deduction on properties formerly owned by Union to be the same as when in the hands of Union, namely, $2,800,000. The Commissioner's determination was that Swiss had acquired the properties by virtue of a nontaxable reorganization. He also determined that the $2,000,000 par value of capital stock and the $2,000,000 of notes paid to Pynchon & Company formed part of the cost of acquiring the Union stock and that Swiss was therefore not entitled to any deduction for amortization of discount on the notes. Swiss appealed to the Board of Tax Appeals, asserting that its base for depletion was the cost to it of the properties acquired from Union, $7,906,043.32, and in the alternative, if the capital stock and notes were not part of its cost, it was entitled to deduction for amortization of expense and discount on the notes.

Shortly before the hearing upon the Swiss petition for review, the Commissioner abandoned the position that the taxpayer had acquired the properties through reorganization, and in an amended answer alleged that the taxpayer had realized a taxable gain of $2,906,043.32 at their acquisition in 1926. He contended that the liquidation of Union was to be treated as wholly independent of the purchase of its stock. In arriving at the alleged profits the Commissioner asserted the taxpayer's cost to be $5,000,000, disregarding the notes and stock issued in the process of acquiring the Union stock, and the profit the difference between that amount and the admitted value of the properties. The position of the taxpayer was that the acquisition of Union stock and the liquidation of that company were merely steps in a unitary plan to acquire the Union oil producing properties, and that no taxable gain was realized since the properties were still owned by it, that even if the Commissioner's theory is accepted and the liquidation of Union treated as a separate transaction, the gain alleged to have been realized was erroneous because of the exclusion of the notes and stock as elements of cost.

A division of the Board sustained the Commissioner. (The decision was not reviewed by the full Board.) It was held that while Combs was originally authorized to negotiate for the purchase of either the assets or stock of Union, the contract actually entered into was with the stockholders for the purchase of stock. Union was not a party to this transaction, and its dissolution was not immediately contemplated since its existence was to continue until an amount called for by the contract should be paid out of earnings, whereupon its property was to be mortgaged and its notes to be delivered to its old stockholders. Moreover, it did hold and operate its properties for almost a year, during which the taxpayer as sole stockholder received all benefit and dividends from its earnings. Besides, Union was a separate taxpayer during 1925 and joined with Swiss in a consolidated return for part of that year. It was therefore concluded that Swiss pur-

chased the stock of Union and in a separate transaction acquired its assets upon dissolution, and that these circumstances might not be disregarded for tax purposes.

It is now conceded that the acquisition of Union stock by Swiss was not, as originally determined by the Commissioner, in pursuance of a "reorganization," for it is settled that the statutory definition of reorganization cannot be stretched to exempt from taxation gains resulting from a sale of properties for cash. Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Cortland Speciality Co. v. Commissioner, 2 Cir., 60 F.2d 937, 939; Sarther Grocery Co. v. Commissioner, 7 Cir., 63 F.2d 68.

The question remains, however, whether if the entire transaction, whatever its form, was essentially in intent, purpose and result, a purchase by Swiss of property, its several steps may be treated separately and each be given an effect for tax purposes as though each constituted a distinct transaction. It is true that Swiss acquired all of the stock of Union. But this is not decisive, for a transitory ownership of stock is not necessarily of legal significance. Helvering v. Bashford, 302 U.S. 454, 458, 58 S.Ct. 307, 309, 82 L.Ed. 367. It has been said too often to warrant citation that taxation is an intensely practical matter, and that the substance of the thing done and not the form it took must govern. This principle has been repeatedly invoked by the Commissioner and applied by the Board. Carter Publications, Inc., v. Commissioner, 28 B.T.A. 160; Warner Co. v. Commissioner, 26 B.T.A. 1225; George Whittell & Co., Inc., v. Commissioner, 34 B.T.A. 1070. And without regard to whether the result is imposition or relief from taxation, the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Tulsa Tribune Co. v. Commissioner, 10 Cir., 58 F.2d 937, 940; Ahles Realty Corp. v. Commissioner, 2 Cir., 71 F.2d 150; Helvering v. Security Savings Bank, 4 Cir., 72 F.2d 874. The Prairie Oil & Gas Case, supra, bears to the case at bar a close resemblance. It is not to be distinguished by the fact that the issue there was whether there was a reorganization so as to fix the base for depletion deductions. The prin-

ciple governing decision was that a single transaction must be considered singly and not be divided into its several steps, each to be considered as a separate transaction in respect to tax liability.

It is not decisive that the purpose of Swiss to acquire the Union properties is not recited in formal agreements executed to bring about that result if such purpose is disclosed by circumstances which beyond controversy proclaim it. Nor does the fact that the Union stock was held by Swiss for almost a year destroy the transitory character of such holding when the terms of the contract are considered. Swiss could not obtain the stock nor liquidate Union until its second payment had been made. Promptly thereafter it did dissolve Union. The filing of a consolidated return for the two corporations in 1925 is likewise unimportant. It has so been considered by the Board. Muskegon Motor Specialties Company v. Commissioner, 35 B.T.A. 851.

The plan of the taxpayer to secure the Union properties is fully disclosed by the exhibits and the witnesses in the case. This court had occasion to consider the essential character of the transaction upon an identical record in Lamprecht v. Swiss Oil Corp., 6 Cir., 32 F.2d 646. By stipulation the exhibits and other evidence in that case have been imported into this. We said there [page 647], "It [Swiss] desired to procure profitable oil-producing properties," and again, "It clearly appears to have been, if not the universal, at least the general opinion of the officers and directors of the Swiss Company that it had no recourse but liquidation unless it acquired the Union Gas & Oil Company properties," and still again, in reference to Pynchon, "But through the fact of its acceptance of the purchase option and its controlling representation on the directorate of the Swiss Company [it] became practically interested in the Swiss Company's carrying out of the purchase, and in a very proper sense indirectly—though no less effectively—secured to the Swiss Company the Union Gas & Oil Company properties." In the light of these statements in the Lamprecht opinion we have carefully reviewed the record. It seems clear that the transaction, though in form a purchase of stock, was in substance a purchase of the oil and gas leases belonging to Union. They could not otherwise be acquired. The reservation by the Union stockholders of cash, oil, notes, accounts, credits and securities clearly indi-

cates that all that Union stockholders were selling and all that Swiss was buying were the oil and gas leases. The unused material and equipment on hand and in storage on the properties would be useful in operations, but .they likewise were reserved to be subjects for future barter apart from the stock. The Union stockholders were to pay all taxes and other obligations incurred prior to the initial payment, and to indemnify Swiss against any claims either in tort or upon contract that might accrue against. Union prior to the date of the cash payment. In all essential respects this agreement segregated the oil and gas properties from all of the other assets of Union and freed them from accrued liability. Our conclusion is that regardless of its form the substantial result that was intended to be effectuated by both parties to the transaction, and in fact was effectuated, was a transfer of the oil and gas properties to Swiss, and these properties being still owned by Swiss or its successor, no taxable gain has been realized.

Though the purchase of the Union property in the manner recited was a non-taxable transaction, it is still necessary by reason of the taxpayer's challenge to the cost base employed by the Board for the computation .of depletion to further examine its decision. The division member determined the cost of Union stock to Swiss as $5,000,000, the consideration named in the option from the Union stockholders. He treated the $2,000,000 of notes delivered to Pynchon & Company as having been sold at a discount of $250,000, and assigned no value to the stock of Swiss as an element of cost. He arrived at this determination partly on the ground that the sellers of Union stock received only $5,000,000, and partly by what he called a "before and after" comparison, and reasoned that the cost of obtaining cash might not be added to the cost of property therewith purchased, for it was but the expense of acquiring a capital asset. This method of analysis is but the breaking down of a transaction, single in its nature, into its component parts, and is subject to the infirmity heretofore noted. Before the deal with Pynchon, he reasoned, Swiss had the option but no cash, while Pynchon had the cash but no option. Thereafter Swiss had both the option and the cash, so that all that it acquired for its $2,000,000 of notes and $2,000,000 par of preferred stock was $1,750,000 of cash. The notes were sold at a discount and the stock was pure bonus.

But this ignores wholly the realities of the situation.

■ Prior to the deal with Pynchon the taxpayer had an .option to purchase property for $5,000,000, which in the Lamprecht Case, supra, was found to be reasonably worth more than $2,250,000 in excess of the agreed purchase price to the defendant corporation. The evidence in that case on value ranges from something less than $8,000,000 as a minimum to $12,500,000 as the maximum. Prior to the Pynchon transaction this increment of value inherent in the Swiss bargain with Union was unavailable to Swiss because it could not finance the deal. Following the transfer of the option to Pynchon, and there is little doubt that the option was so transferred, the Board .making no finding to the contrary, this increment of value was with Pynchon. But Pynchon was not an oil operator. It dealt in securities, and it held the option subject to obligations involved in the financing plan. When the option was re-transferred to Swiss, the latter's situation had completely changed. It now held cash more than sufficient to meet the initial payment to Union stockholders and the increment of value inherent in its bargain became something realizable. What was before mere expectation became a capital asset, greatly increased the value of Swiss stock, and saved Swiss from the necessity of liquidation. (See the Lamprecht opinion, supra.) For this changed situation it was willing, indeed obliged, to pay. The payment was made in its stock. In a very true sense the fair value of that stock was an element in the cost to it of the Union properties, and should have been so considered in arriving at the base upon which to compute depletion. The Board member made no finding of the value of the Swiss stock. We are empowered to make none.

■ It is true that an inference as to value arises from the determination by the Board member of the discount on Swiss notes permitted to be amortized over the period they were to run. But such inference does not warrant our invasion of the fact finding function of the Board. Besides, there is more than a suggestion in the memorandum opinion that a value of $350,000 inferentially assigned to the Swiss stock for purposes of amortizing discount on Swiss notes, was based not upon any evidence in the case but upon a suggested settlement agreeable to Swiss but declined by the Commissioner. Compromise offers or

acceptances are not to be substituted for evidence on questions of value. The decision of the Board should be set aside and the cause remanded for a determination of the fair value of the Swiss stock as an element in the cost of acquiring the Union stock and for establishing the fair base for computing depletion.

The case was decided upon the theory that the liquidation of the Union Company resulted in taxable gain to Swiss, and on the theory that the value of the stock conveyed to Pynchon formed no element of the cost of Union stock to Swiss. Accordingly the base for computation of depletion was determined to be $5,000,000, and the discount on the Swiss notes to be amortized over the period they were to run was determined to be $600,000. The latter figure was arrived at inferentially at least by considering the stock as paid for in cash, dollar for dollar, on the basis of a value of $350,000, leaving a cash consideration for the $2,000,000 of notes of $1,400,000. This discount was amortized over the period involved. The Commissioner, conceiving that if the Board's decision is set aside or modified on either or both of the principal issues raised, its determination of allowable deductions for discount and depletion should not stand, petitioned for review of the Board's decision in respect to both discount and depletion for the years 1927 to 1930 inclusive. In view of our conclusions upon the main issues, the decision should be set aside in respect to deductions for each year involved and allowable deductions redetermined.

The decisions of the Board of Tax Appeals are therefore reversed, and the causes remanded for further proceedings in conformity herewith.

HAMILTON, Circuit Judge (dissenting).

I am unable to concur in the opinion of the Court.

I believe the majority opinion applies the facts in a manner which reaches an end not justified either by general corporation law or taxing statutes. A corporation is not a fiction but a creature of the law and "its ownership in a nonconductor that makes it impossible to attribute an interest in its property to its members. Donnell v. Herring-Hall-Marvin Safe Co., 208 U.S. 267, 273, 28 S.Ct. 288, 52 L.Ed. 481." Klein v. Board of Supervisors, 282 U.S. 19, 24, 51 S.Ct. 15, 16, 75 L.Ed. 140, 73 A.L.R. 679.

All of the stockholders collectively of the Union Oil & Gas Company had the legal right to sell their stock to the Swiss Company without the consent of the corporation and such sale did not pass title to the corporate assets. It is a fair presumption from the evidence in the case that the Union would not sell its assets because it would be required to pay a tax on the profit and it is also fair to presume the Swiss was willing to take this chance.

It is stated in the majority opinion:

"For reasons with which we are not here concerned, the Union Company had refused to sell its properties, but on July 29, 1934, Combs, President of Swiss, and Thraves, a stockholder, acting for Swiss, secured an option to purchase all of the Union stock for Five Million Dollars, of which a first payment of $1,500,000 was to be made upon its exercise."

I am unable to understand why we are not concerned with the sale of the Union properties and, if it refused to sell them, how it can be contended that they were acquired by a purchase of all of its outstanding stock. Ordinarily the transfer of all corporate assets requires corporate action which is regulated by statute. The Indiana regulations are found in Burns' Annotated Indiana Statutes, Watson's Revision, Vol. 4, Chap. 24, § 4822 et seq.

There is no showing in the record that the sale which the majority opinion finds was made had either statutory or corporate approval. The rule of practicability applies not only to the interpretation of taxing statutes but also to their administration. The reason for the rule is that the tax falls on ordinary business transactions conducted in the ordinary business way and the records of such transactions from which the taxing authorities obtain information are kept in the ordinary business way.

So far as the record shows, no sale of the Union assets appeared on its books and in my opinion there is no applicable taxing statute requiring it to pay a tax on income realized by its stockholders from the sale of its entire capital stock.

The income taxing statutes provide that gain or loss arises from the acquisition and subsequent disposition of property either for cash or by exchange. It is realized when, as the result of a transaction between the owner and another person, the property is converted into essentially different property.

The majority opinion ignores the fact that we are dealing with three separate taxable entities, (1) the stockholders of the Union Oil & Gas Company, (2) the corporation and (3) the Swiss Oil & Gas Company.

Section 201 (c) of the Revenue Act of 1926, 44 Stat. 10, provides that "amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock," and "the gain or loss to the distributee resulting from such exchange shall be determined under section 202, but shall be recognized only to the extent provided in section 203."

None of the exceptions contained in section 203 applies. The general rule of section 203(a) is that the entire amount of the gain determined under section 202 shall be recognized. That gain is the excess of the amount realized from the exchange of the stock over its cost. The amount realized is the fair market value of the property received. Sec. 202 (a) and (c).

If the Union sold its assets under the theory stated in the majority opinion, it owed a tax on the gain realized from the sale and its stockholders at the date of its dissolution owed a tax under Sec. 201(c), supra. The facts, without dispute, show that the Swiss was the sole stockholder at the date of dissolution and under the plain language of the Statute, is taxable.

The majority opinion relieves the Swiss of liability as a stockholder at the date of dissolution on the theory that its purpose was to acquire the assets of the Union, not its stock. It seems to me that the object of the Swiss was to work a dissolution of the Union and, as an incident thereto, acquire its assets and when it caused a dissolution of the Union it exchanged its shares of stock for the physical assets of the Union, essentially different property.

Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309, is unlike this case. There, the stockholders and the corporation jointly contracted with the Prairie to sell the corporate assets and a direct transfer was made by the corporation. There was no such agreement between the Swiss and Union and no direct conveyance of assets. The only question the Court had before it in the Prairie Oil & Gas Company Case was whether the transaction was a reorganization within Sec. 204(a) (7) of the Revenue Act of 1926, 26 U.S.C.A. § 935 (a) (7), now 26 U.S.C.A. § 113.

Tulsa Tribune Co. v. Commissioner of Internal Revenue, 10 Cir., 58 F.2d 937, involved the value of capital stock for tax purposes under the Revenue Act of 1918, § 326, 40 Stat. 1092. The organizers of the corporation acquired the assets of another corporation for a fixed sum and transferred them after purchase to the appellant and sought to revalue them for the purpose of determining its invested capital. The court ruled that the purchasers of the assets were the promoters or agents of the corporation. This case is not helpful to a decision here.

In Ahles Realty Corporation v. Com'r of Internal Revenue, 2 Cir., 71 F.2d 150, the taxpayer acquired all of the capital stock and assets of another corporation in exchange for its capital stock and debentures. After the transfer the old corporation was dissolved and the taxpayer subsequently sold some of the real estate it had acquired and sought to revalue it for the purpose of determining its gain. The court decided the property was acquired in a reorganization under the provisions of Sec. 203 (h) (1) of the Revenue Act of 1926, 26 U.S. C.A. § 934 (h) (1), now 26 U.S.C.A. § 112, and its basis of gain was the cost of the property to the old corporation.

The difference between the cited case and the one at bar is stated in the opinion of the court as follows [page 151]:

"The real estate was not acquired by the petitioner in liquidation proceedings, but in connection with a reorganization."

In the case of Helvering v. Securities Savings Bank, 4 Cir., 72 F.2d 874, the Bank acquired from the stockholders of another bank, their stock at $140 per share and immediately put in charge of the Bank its own officers and directors and simultaneously therewith entered into a contract with the Bank to acquire all of its assets for cash. It then declared to itself a liquidating dividend less than the cost of the stock. In computing net income it claimed as a deduction the difference between the cost of the bank stock and the dividends. The court held that the Bank had acquired intangibles in the form of good will not shown on the books of the old bank and further that the sale of the assets of the Bank was not a free and voluntary sale because made by its own officers who fixed the sale price. This case has only a superficial application to the one here.

The case of Burnet v. Riggs National Bank, 4 Cir., 57 F.2d 980, is very similar to

the one in controversy. There the Riggs Bank, at the solicitation of the Comptroller of the Currency in January 1922, purchased all of the capital stock of the Hamilton Savings Bank and in June of the same year surrendered all of the stock of the purchased Bank in exchange for its assets, and liquidated the old bank at a loss.

The sole question in the case was whether the corporation had sustained a deductible loss under the Revenue Act of 1921, 42 Stat. 227. The Court said [page 983]:

"Had respondent made a profit on the transaction as shown at the time of liquidation it would unquestionably have had to pay a tax on that profit, and it must follow that it should be allowed to deduct the loss in making up its tax return. There can be no better time to calculate a profit or a loss than as of the date of liquidation.

"The separate corporate entities of the Savings Bank and the Riggs National Bank are not to be entirely ignored in considering this question, even though the entire stock of the one was owned by the other and they were affiliated."

The ultimate purpose of the Swiss to acquire the assets of the Union cannot alter the fact that it actually acquired the stock and held title to it for nearly a year under an agreement preventing liquidation. It did not acquire title to the Union assets by the contract with its stockholders, but by liquidation after it had acquired title to the stock.

The Government must measure its exactions by the acts in fact done and a taxpayer discharges his obligation to the Government by basing his tax on profit in fact realized.

The theory of separate corporate entity is a basic one and recognized by all internal revenue statutes. A separate tax is imposed on corporations and their distributions to stockholders are taxed in only a limited way. Specifically enumerated corporations are exempt from tax and distributions of corporate assets in liquidation are a distinct type of income.

It is only in unusual cases that corporate form may be disregarded in determining tax liability. Burnet v. Commonwealth Improvement Company, 287 U.S. 415, 420, 53 S.Ct. 198, 199, 77 L.Ed. 399. The circumstances in this case are not so unusual as to justify an exception. Dalton v. Bowers, 287 U.S. 404, 410, 53 S.Ct. 205, 206, 77 L.Ed. 389.

I am of the opinion from the facts in this case and the reasonable inferences and deductions therefrom, that the Union Oil & Gas Company deliberately refused to sell its assets because of the resulting tax burden and that the Swiss just as deliberately purchased the stock of the Union with the intent to dissolve it and thus acquire its assets and by so doing, assumed the tax burden falling on it at the time of dissolution.

There is no showing in this record that the Union Oil & Gas Company reported any profit or paid any taxes growing out of the transfer of its assets to the Swiss Oil Corporation. It is fair to assume that so far as this case is concerned there has been an entire escape from tax liability on the profits realized in the exchange of assets between the Union and the Swiss except that paid by Union stockholders on the sale of their stock.

I am of the opinion that the $1,750,000 cash received by Swiss from Pynchon & Company with which to purchase the stock of the Union should not be added to the cost of the Union stock in determining profit on liquidation. This transaction was simply the borrowing by Swiss from Pynchon of the money with which to purchase the stock. The orders of the Board should be affirmed.