JUAN RAMOS BADILLO, Appellant and Appellee, *v.* SOL LUIS DESCARTES, SECRETARY OF THE TREASURY, Appellee and Appellant.

No. 10793.   Argued January 26, 1953.—Decided July 8, 1954.

838

*J. B. Fernández Badillo, Acting Attorney General,* and *J. C. Santiago Matos, Assistant Attorney General,* for appellant. *Manuel A. García Méndez, J. B. García Méndez* and *Juan A. Faría* for appellee.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

The Secretary of the Treasury notified the taxpayer Juan Ramos Badillo of certain deficiencies connected with his income tax returns for the years 1940, 1942 and 1944. After the corresponding administrative hearings and stipulations regarding some of the items contested on appeal before the former Tax Court of Puerto Rico, the case has narrowed down to a determination of the possible gain obtained by the taxpayer by virtue of a condemnation proceeding.

The juridical facts which should serve as basis for the study of the present case are the following: In May 1939, several surveyors of the federal branch of our Government, surveyed a property of 90 odd acres owned by the taxpayer, located within a lot of about 1,500 cuerdas, which the Government of the United States intended to acquire for the establishment of a military base in the city of Aguadilla, Puerto Rico (Tr. 8 and 93). In May 1939, the taxpayer devoted the property, condemned four months later, to the following uses and services: (1) sugar cane planting (Tr.

7), (2) coconut planting (Tr. 39), (3) "coollo" planting (Tr. 39), (4) truck gardening (Tr. 40), (5) cattle raising (Tr. 7), (6) dry goods store (Tr. 7), (7) for wholesale and retail provisions warehouse (Tr. 7), (8) dwelling house (Tr. 7) and (9) two small houses for rent (Tr. 7).

When the condemnation of his only farm was already imminent, the taxpayer began looking for another rural property to transfer his sugar cane quota, his animals and to continue his truck gardening. He also looked for premises to install his business and residence. It was not easy to find farms or business premises (Tr. 15 and Tr. 24). "After the condemnation the farmers underwent a very serious situation . . . formerly each of them had their own little farms . . . afterwards things changed, everything became difficult" (Tr. 15) since "1500 cuerdas of land were condemned" (Tr. 16); the taxpayer had to rent two houses from Edwin Hernández, a neighbor, to accomodate temporarily the provisions on stock, since "in small towns it is not easy to find big premises" (Tr. 24).

On July 26, 1939, that is, 42 days before the federal condemnation proceeding was filed, he bought a farm of 32 cuerdas and 80 hundredths for $3,500 (Tr. 68–74), to which he transferred his sugar cane quota, his cattle and resumed his truck gardening (Tr. 40).

On September 6, 1939, the Government of the United States of America filed in the U. S. District Court for the District of Puerto Rico, a condemnation proceeding against 1877.39 cuerdas of land located at Barrio Malezas Altas, Aguadilla, Puerto Rico, (Tr. 94). After the declaration of possession was filed by the U. S. Secretary of War, on that same month of September the taxpayer was notified that he had to vacate the farm within the following twenty days. Finally, he was granted nine or ten more days for eviction (Tr. 24), to expire about October 6, 1939.

On November 13, 1939, that is, 38 days after he vacated his property, the taxpayer bought a frame house, zinc roofed, on a lot 10½ meters wide by 15½ meters length, located at La Paz Street of Aguadilla for $1,800 (Tr. 74–77), to which he moved temporarily (Tr. 17) and which he leased when he moved to the upper story of the premises built for the dry goods store (Tr. 22).

On March 21, 1940, that is, five months and days after the order of eviction, the taxpayer bought a lot of 138.50 square meters at Stahl Street of Aguadilla for $1,315.75 (Tr. 79–82), for the purpose of building a warehouse (Tr. 19), which he failed to build because he acquired a nearer lot and therefore decided to build a house for rent (Tr. 21) in the first lot acquired.

On June 20, 1940, that is, eight months and days after the order of eviction, the taxpayer bought a lot of 342.22 square meters at Stahl Street of Aguadilla for $1,368.88 (Tr. 87–90) in order to erect a building for his dry goods business in the lower story and a dwelling for himself and his family in the upper story (Tr. 35), which premises and dwelling he occupied on the date when the case was heard in the Tax Court of Puerto Rico. The Secretary of the Treasury admits that the taxpayer spent $11,726.76 in the construction of this building at some date between the years 1941–42.

On July 2, 1940, the taxpayer received the first payment for his condemned property, a check of the Federal Court for the amount of $20,075.24 (Tr. 24).

On August 21, 1940, that is, ten months and some days after the order of eviction and 50 days after receipt of his first payment, the taxpayer bought a frame house together with another small frame house in a lot five meters and ten centimeters wide by 27 meters and 35 centimeters deep, at Stahl Street of Aguadilla, for $1,000 (Tr. 84–86) for the purpose of building a provision warehouse which was al-

ready built on the date when the case was heard by the Tax Court. On February 16, 1942, after the corresponding litigation on the real value of the condemned property, the taxpayer received a second and last payment by check of the Federal Court for the amount of $13,060.78, (Tr. 94).

A comparison between the properties owned by the taxpayer when his property was condemned, to wit: (1) a farm, (2) a provision warehouse, (3) a dry goods store, (4) a dwelling house and two houses for rent, and the new properties owned by the taxpayer when he was investigated in 1949, to wit, (1) a farm, (2) a provision warehouse, (3) a dry goods store with dwelling in the upper story, (4) two houses for rent, one of two stories, shows that the new properties acquired are all related in use or services to the first properties condemned.

The Secretary of Treasury likewise admits, in his notice of deficiency as well as during the hearing of the case, that from the two amounts received by the taxpayer, the following items must be deducted because they represent no gain whatever: $4,213.35, which represents the cost of the plantings destroyed, (Judgment Roll 6) and (Tr. 25), which represented a reimbursement as the payment of the plantings; $1,211.95 which he paid a part-owner named Acevedo for his rights in the condemned property. As to the item for attorney's fees paid to Juan Bautista García Méndez, there was no direct evidence, but during the hearing of the motion for reconsideration, the Secretary of the Treasury announced that he agreed to reduce from the computation "two thousand odd dollars" (transcript of evidence of the hearing on reconsideration, p. 6) and during the whole discussion of the case the taxpayer alleged that an item for attorney's fees of $2,079.83 should be deducted. At any event, that item is not unreasonable or speculative, whether considered as payment for the whole proceeding or as pay-

ment for the increase obtained over the first assessment made and we see no reason why the new computation should be set aside.

The evidence introduced may be summarized in the following mathematical analyisis:

Amounts received as condemnation price:

| | | |
|---|---|---|
| July 2, 1940 | $20, 075. 24 | |
| February 16, 1942 | 13, 060. 78 | |
| Total | $33, 136. 02 | |

Deductions:

| | | |
|---|---|---|
| Cost of the plantings | $4, 213. 35 | |
| Payments to the part-owner | | |
| Acevedo | 1, 211. 95 | |
| Attorney's fees | 2, 079. 28 | |
| Total deductions | | $7, 504. 58 |
| Total to be reinvested | | 25, 631. 44 |

Amount of reinvestments:

| | | |
|---|---|---|
| Farm of 32.80 cuerdas bought on July 26, 1939 | 3, 500. 00 | |
| Frame house and lot at Paz St. bought on November 13, 1939 | 1, 800. 00 | |
| Lot at Stahl St. bought on March 21, 1940 | 1, 315. 75 | |
| Lot at Stahl St. bought on June 20, 1940 | 1, 368. 88 | |
| Lot at Stahl St. bought on August 21, 1940 | 1, 000. 00 | |
| Cost of the building on the lot bought on June 20, 1940 | 11, 726. 76 | |
| Total reinvestments | | 20, 711. 39 |
| Money received and not reinvested | | $4, 920. 05 |

In the preceding mathematical analysis, we have employed the practical method suggested by the case law in

the sense: (1) that all gain not used either to replace the converted property or held in a replacement fund for that purpose, shall be taxed and (2) that in computing the amount of taxable gain, the question at issue should be considered as a whole, to see if the transaction or transactions involved comply with the provisions of the statute: *Francis V. Dupont* v. *Commissioner of Internal Revenue*, 31 BTA 278, 282 (Arundell), (1934); *Commissioner of Internal Revenue* v. *Ashland Oil & Refining Co.*, 99 F. 2d 588, 591 (Simons), (1938); *Sneed* v. *Jones*, 103 F. Supp. 802, 805 (Vaught), (1952).

In its judgment of May 15, 1952, the former Tax Court of Puerto Rico reached the conclusion that the deficiency imposed by the Treasurer corresponding to the year 1940 was untenable since the transaction which gave rise to any taxable capital gain on the part of the taxpayer, took place on September 1939, and on that date the dominion title of the plaintiff's property passed to the United States of America subject to no conditions and as of that date, the taxpayer was the owner and had at his disposal the fair award of $20,075.24 deposited by the U. S. Government; that the fact that the taxpayer did not withdraw the money until July, 1940 did not alter the situation of law formerly described, it being concluded that if the taxpayer obtained any capital gain as a result of the afore-mentioned condemnation, on the basis of the original award deposited, he made the gain in the year 1939 and not in 1940. As to the gain for the year 1942, the situation was different since the additional award of $13,060.78, in all probability, was the result of the litigation of the condemnation proceeding, that is, the judicial fixing of a fair compensation, so that it could not be said that it was at the taxpayer's disposition, but only as of the date when the Court so decreed, that is, since February 16, 1942. There being no evidence that with this additional compensation of $13,060.78 the taxpayer acquired

any property related to the use or service of the condemned property or that the establishment of a replacement fund was applied for, the capital gain charged by the Treasurer for the year 1942 should be upheld.

The Secretary of the Treasury appeals from the part of the judgment which denies the assessment of gain for the year 1940 and the taxpayer appeals from the part of the judgment recognizing the assessment of gain for the year 1942. The objection of the Secretary of the Treasury may be termed as follows: "it is an essential requirement that the money employed in the purchase of a similar property, be the proceeds of the condemnation, or at least that it can be traced to the core of the condemnation; in line with this rule, it is well settled that *before the condemnation the taxpayer cannot buy a similar property out of his own funds* and then request the benefits of § 6 (*b*) (5), when he receives the proceeds of the condemnation", (brief pp. 5–6). The taxpayer's objection may be termed as follows: "The taxpayer was entitled to invest money in anticipation, within the exceptional facts of this case, in the acquisition of property similar in use and service to that condemned" (first error); as to the assessment of gain for the year 1942, "the respondent Court erred in holding that there was no evidence showing that the amount of $13,060.78 was spent by the taxpayer in any property, whether or not similar in use to the condemned property."

██ The law involved in the instant case is § 6 (*b*) (5) of the Income Tax Act of 1924, which provides:

"If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition *or condemnation, or the threat or imminence thereof*) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, *or into money which is forthwith in good faith,* under regulations prescribed by the Treasurer, expended in the acquisition of other property similar or related in service or use to the property so

converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. *If any part of the money is not so expended,* the gain, if any, shall be recognized, *but in an amount not in excess of the money which is not so expended,"*

and which is related to § 30 of Regulation No. 1 of August 6, 1925 of the former Treasurer of Puerto Rico, which provides:

"Section 6(*b*)(5) deals with those cases where the property is compulsorily or involuntarily converted into similar property or into cash as a result of fire, shipwreck, theft, *condemnation* or other similar causes listed in the statute. If the property so destroyed, robbed, seized or condemned, is replaced in its kind by property similar or related in service or use, no gain or loss shall be recognized: However, if the former property is *compulsorily or involuntarily converted into cash* said profit or loss shall be recognized, *unless said money is forthwith expended* under regulations prescribed by the Treasurer with the approval of the Governor, in any of the following manners: (1) in the acquisition of other property similar or *related in service or use to the property so converted,* (2) in the acquisition of the control of a corporation owning such other property, or (3) in the establishment of a replacement fund . . . If any part of the money is not so expended, the gain, if any, shall be recognized *but in an amount not in excess of the money which is not so expended . . ."*

Since the case at bar does not deal with the exchange of a property for a similar one, as happens frequently when the conversion is realized between an insurer and an insured, but of a property converted into money, § 6(*b*)(5) of the Act as well as § 30 of the Regulation establish the rule that *said money be forthwith in good faith expended in the acquisition of other property similar or related in service or use to the property so converted, or in the establishment of a replacement fund,* and if any part of the money is not so expended, a gain shall be recognized, but in an amount not in excess of the money which is not so expended.

The general rule governing the question at issue is that the involuntary conversion of a property may compel the taxpayer to make a profit without regard to his own wishes and therefore, taxation of this income should be deferred until a subsequent reasonable date, during which the taxpayer may reinvest the income in property similar or related in service or use to the property so converted. *Herder* v. *Helvering*, 106 F. 2d 153, 160, Vinson, (1939); *Francis V. Dupont et al.*, v. *Commissioner of Internal Revenue*, *supra*, p. 281.

Slowly the case law has been clarifying each of the concepts comprised in the rule. "Forthwith" has been interpreted as meaning "as soon as by reasonable exertion, confined to the object, it may be accomplished"; *Paul Haberland* v. *Commissioner of Internal Revenue*, 25 B.T.A. 1370, 1379 (Arundell), (1932), (time considered as reasonable from October 1921 until November 1, 1922); *August Buckhardt* v. *Commissioner of Internal Revenue*, 32 B.T.A. 1272, (Arundell), (1935), (time considered as reasonable from March 26, 1931 until the first months of 1933); *In re Goodman's Estate*, 199 F. 2d 895, (Staley), (1952), (time considered as reasonable, 15 months). "Good faith" has been construed to mean that the conversion is not pretended to avoid income tax; *August Buckhardt* v. *Commissioner of Internal Revenue*, *supra*, p. 1277. "Other property similar or related in service . . . to the property so converted" has been construed to mean that the new property acquired should perform the same function which the former property did within the taxpayer's business: *Lynchburg National Bank & Trust Co.* v. *Commissioner of Internal Revenue*, 208 F. 2d 757, 758, (Soper), (1953). It has been also held that the taxpayer does not have to apply for the establishment of a replacement fund, if it is clear that it is impossible for him to reinvest the proceeds within a reasonable period of time: *August Buckhardt* v. *Commissioner of Internal Revenue*, *supra*, p. 1277.

■ In brief, in any case dealing with a compulsory or involuntary conversion of property into money, the taxpayer has only to prove: (1) that the properties acquired prior to the receipt of the money were acquired in the face of imminent danger of condemnation, within a reasonable time according to the imminence or threat of condemnation, and that the properties acquired after receiving the money were acquired within a reasonable time according to the nature of the transaction or the property converted, employing for such purpose the funds received; (2) that he acquired them in good faith, that is, without intending to avoid income tax; and (3) that the new properties have the same functions (similar or related in use) as those of his former properties, to be entitled to ask that no recognition of gain be admitted, although he has failed to apply for a replacement fund. His obligation to apply for such fund arises when it is impossible to reinvest within a reasonable time —computed according to the circumstances of each case—the money that he received for the converted property.

However, the objection of the Secretary of the Treasury, at least as to the unrecognized gain during the year 1940 by the former Tax Court of Puerto Rico, is that since it is essentially required that the money employed in the purchase of the new property proceed from the condemnation award and that it may be traced as such, the taxpayer could not, prior to the condemnation, acquire with his own money any similar property, in order to avail himself later of the benefits of § 6(b) (5), when he received the money from the condemnation award.

To support his point of view he refers to Regulation No. 111 of the U. S. Secretary of the Treasury, § 112(f) (1), which provides:

"In order to avail himself of the benefits of Section 112 (f) [counterpart to our § 6(b) (5)] it is not sufficient for the taxpayer to show that subsequent to the receipt of money from a condemnation award he purchased other property similar or

related in use. The taxpayer must trace the proceeds of the award into the payments for the property so purchased. It is not necessary that the proceeds be earmarked, but the taxpayer must be able to prove that the same were actually reinvested in such other property similar or related in use to the property converted."

We should bear in mind that our state Regulations do not impose on the taxpayer the obligation to trace the proceeds. But § 6(b)(5) of our Act No. 74 of August 6, 1925 being identical with § 203(b)(5) of Public Law No. 176 of June 2, 1924 of the 68th Congress, 43 U. S. Statutes at Large 253, we may conjecture that to the extent that the Federal Regulations are not contrary to the Federal law, a similar provision should be considered as forming part of our state law, even if it has not been the object of specific regulation.

Now then, what the taxpayer alleges and proves is that his investments were made because of imminent danger of condemnation and before receiving his award from the block condemnation of the 1500 cuerdas in the case herein, with the exception of two properties which we shall consider apart, and therefore he could not prove that the money employed issued from the proceeds of the condemnation. The evidence shows that it is not a mere rumor or a vague speculation of the taxpayer as to the danger of condemnation but an imminent danger as conceived by our own statute, that is, an imminent danger of condemnation solved definitively in a real condemnation of the former properties. This fact distinguishes the instant case from our ruling in *Santiago* v. *Tax Court*, 71 P.R.R. 688, 691 (De Jesús), (1950). Undoubtedly, our § 6(b)(5) does not recognize a gain when the reinvestment is made in imminent danger of condemnation. It is not difficult to conclude that neither does it recognize a gain when the reinvestment is made in properties connected or related in use or service to the former properties, before the proceeds of the condemnation are received.

If we were to apply the rule that no gain shall be recognized only in those cases where reinvestments are made with the proceeds of the condemnation, the legislative intention of making no recognition of gain when the reinvestments are made upon imminent danger of condemnation and before receiving the proceeds thereof, would be defeated: 3 Merten's Law of Federal Income Taxation 342, (Callaghan and Company ed.), (1942).

Furthermore, we should not clothe the words "to trace the proceeds" with a magical content, having no need to rest on the reality of things or on the logical principles of reason. What the statute has intended to avoid is for properties acquired before or after the condemnation in the normal course of business, which have nothing to do with the forced reinvestment or the involuntary gain created by a condemnation, to be included within the mechanics of tax evasion. The proposition advanced by the Secretary of the Treasury was so harshly criticized by the American commentators and judges, that in 1951 the Congress of the United States legislatively abolished it: *Stanley* v. *Kilcullen: The Federal Income Tax*, p. 187, (Ed. of The Tax Club Press, (1951); 65 U. S. Stat. at Large 733, 734, 26 U.S.C.A., § 112 Annual Supplement corresponding to the year 1954, p. 39). We understand that it has also been abolished by the new income tax act drafted by our own Legislature. See also *Francis V. Dupont et al.*, 31 B.T.A. 278, 280, (Arundell), (1934), as to money taken as loan before an imminent danger of condemnation. *Bandes* v. *Commissioner of Internal Revenue*, 69 F. 2d 812, 813 (Swan),(1934), as to money taken as loan prior to the receipt of the proceeds of the adjudication; *Sneed* v. *Jones, supra,* as to money taken as loan prior to the condemnation proceeding.

With regard to the two properties acquired after receiving the proceeds of the condemnation, a lot at Stahl St. at Aguadilla, Puerto Rico (Tr. 81–85) and the construction of a building in another lot of Stahl St., at a cost admitted by the Secretary of the Treasury of $11,726.76, we believe that the source of the proceeds was established. The taxpayer declared that he surrendered the checks, the plans, the deeds, all he had in his possession, to an employee of the Income Tax Bureau, that they were lost and were never returned to him (Tr. 32–33), which was not contradicted by the Secretary of the Treasury, that the payments were made from account No. 2, a separate account where he had deposited all he had received from the Government, (Tr. 32).

We are satisfied with the analysis of the facts in the instant case since the properties purchased by the taxpayer since July 26, 1939 until August 21, 1940, were acquired within a reasonable period of time, according to the emergency created by the condemnation of some 1500 cuerdas of land in the rural zone and the lack of commercial premises, which compelled the taxpayer to build his own, that those properties were acquired by the taxpayer in good faith, because of the emergency created in his business by the condemnation of the property where he had his crops as well as his dry goods, wet goods, dwelling house and houses for rent, that the new properties acquired or built by the taxpayer were all related in use, service or operation to the taxpayer's former properties, that the only property which he acquired before the condemnation proceeding was commenced, a rural property, was acquired because of the imminent danger of condemnation, in order to transfer his sugar cane quota, his cattle, and to begin his new crops, that he acquired the other properties after the condemnation but before receiving the money thereof, in order to prevent paralization of his dry goods and wet goods business, to find a dwelling for his family and to replace the rented houses that he had on

the condemned property, that the only reinvestments that he made after receiving the condemnation award was the purchase of a house and the erection of business premises for his dry goods and dwelling for his family, all of which were related to the use, service, or operation of the properties condemned, the proceeds involved in both investments, being traceable, that if the conversion is fully examined, it would show no other gain than the difference between the total amounts received by the taxpayer—deducting the expenses incurred in the defense of unfair valuation and the reimbursements recognized by law—and the total amount reinvested in good faith by the taxpayer to replace the use, service and operation of the former properties, as they appear in the mathematical analysis included herein.

The judgment appealed from will be modified according to the terms of this opinion and new computations timely filed according to our ruling herein.