## UNITED STATES v. GENDRON WHEEL CO.
### No. 7429.

Circuit Court of Appeals, Sixth Circuit.
Nov. 18, 1938.

A. F. Prescott, of Washington, D. C. (Robert H. Jackson, J. Louis Monarch, Norman D. Keller, and E. E. Angevine, all of Washington, D. C., Emerich B. Freed, of Cleveland, Ohio, and Gerald P. Openlander, of Toledo, Ohio, on the brief), for appellant.

John E. Daniells, of Toledo, Ohio (John E. Daniells and Ira C. Taber, both of Toledo, Ohio, on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and DRUFFEL, District Judge.

**58**

HICKS, Circuit Judge.

Suit against the United States to recover $31,266.66, the amount of income tax, plus interest, assessed against appellee, the Gendron Wheel Company (herein called Gendron), for 1927, and paid by it under protest.

The District Court, hearing the case without a jury, gave judgment against appellant, the United States.

The question is, whether a transaction on December 7, 1927, between appellee and the American-National Company (herein called American) constituted a sale of appellee's assets. If it did, appellee correctly reported a loss of $297,730.41 from "Sale of Assets" in its return and the judgment must stand. Otherwise a reversal is required.

Gendron and American were competitors in the manufacture of juvenile vehicles. For some time, prior to September 8, 1927 (all dates are for 1927 unless otherwise indicated), Vogel, President of appellee, and Diemer, President of American, had carried on negotiations relative to the purchase of the Gendron business by American. On that date their proposals were embraced in a memorandum for submission to their respective boards. It provided for the sale to American by appellee's stockholders of their 20,000 shares at $75 per share. Appellee's board approved, with certain conditions, not material here. When the matter was submitted to American's board, Mr. Taber, its counsel and also a board member, insisted that the proposal should embody the option to purchase *either the stock or the physical assets of appellee*. He said that "the agreement could be changed by interlining, * * *" and he explained, that, "if all the stock was deposited and at the time of putting up the money it was desired to purchase the assets instead of the stock, the stock could all be transferred into a few persons' names who could be present and waive the notices and authorize the sale of physical assets, but unless we had the option to purchase assets we would be compelled to buy the stock and considered it a poor proposition to operate it as a separate company." The Board authorized the interlineation and directed Diemer to sign the agreement as interlined and appointed a committee to look into the financing of the purchase of the stock or assets.

Vogel and Diemer met again on September 13 and drew up a memorandum embodying a further basis for negotiations pending the consummation of a final contract. An introductory paragraph reads as follows: "Whereas, the American National Company is desirous of *purchasing the stock or the assets*" (other than the realty) "of the Gendron Wheel Company. * * *" (Italics ours.)

The material proposals were: That Gendron should transfer its real estate to a Real Estate Corporation to be organized; that at the time of the transfer there should be paid to the stockholders of Gendron by American, through an agency to be provided, $75 per share, or an aggregate of $1,500,000 for the entire 20,000 shares; that the real estate company should execute a lease to Gendron guaranteed by American for ten years on the real estate for an annual rental; that the lease should provide that at any time during this period the lessee should have the option to acquire the property for $1,000,000 provided that notice should be given not later than January 1, 1937, of its desire to exercise the option.

The transfers were conditioned upon approval of the agreement by the two boards of directors after which the following steps were to be taken: American would deposit $150,000 with the Ohio Savings Bank & Trust Company, the Trustee, as a guaranty that it would buy the entire stock of Gendron in the event that 95% of the certificates were deposited with the Trustee, and that within thirty days of that event it would pay the balance of $1,350,000 or forfeit the $150,000 already deposited as liquidated damages for breach of the agreement. However if the $1,350,000 were deposited, the $150,000 theretofore deposited would be applied on the purchase price of the stock.

It was further agreed that upon approval of the agreement by the respective boards and after American had deposited with the Trustee the $150,000, then Vogel, the President of Gendron, would notify the stockholders of Gendron of the negotiations and request them to deposit their stock with the Trustee, to be paid for when at least 95% of the stock had been deposited. If the 95% were not deposited within forty-five days, American had the option of terminating the transaction and of having the $150,000 deposit returned to it.

This agreement was approved by both boards and American deposited $150,000 with the Trustee.

On September 20, American entered into an agreement with Folds, Buck & Company, Investment Bankers, for underwriting an issue of 6% Gold Debentures to finance the deal. The introductory paragraph of this agreement read:

"The American Company proposes to acquire as a going business *all of the property and assets* (other than real estate and buildings constituting the manufacturing plant) of The Gendron Wheel Company, a corporation of the State of Ohio (hereinafter called the 'Gendron Company'), *or in the alternative at least 95% of the stock* of the Gendron Company or of some other company owning such assets, and in connection therewith shall be required to pay to the vendors of said assets or shares of stock the sum of One million five hundred thousand Dollars ($1,500,000) in cash, and the American Company, for the purpose of procuring a part of such cash desires to create and sell to the Bankers an issue of 6% Gold Debentures, and the Bankers are willing to purchase such debentures upon the terms and conditions hereinafter set forth." (Italics ours.)

By supplemental agreement December 1 was fixed for the delivery by American of its debentures to the Bankers.

On October 18, Gendron and American addressed a joint letter to the Ohio Savings Bank & Trust Company, the Trustee, enclosing: (1) a copy of the agreement of September 13; (2) the resolutions approving it; (3) a check of American for $150,000; (4) a copy of a letter from Folds, Buck & Company acknowledging their willingness to underwrite the debenture issue; and (5) a copy of a letter to the stockholders of Gendron dated that day.

This joint letter directed the Trustee to hold the check, pursuant to the agreement of September 13, until the stockholders of Gendron had deposited 95% of its shares; and that done, to notify American and Gendron and within thirty days thereafter American would pay the balance of the purchase price. The letter noted that the Gendron stockholders were to incorporate a Real Estate Company with a capital of 10,000 shares and deliver the certificates to the Trustee; and directed the Trustee to pay each stockholder who had deposited his certificates $75 per share in cash and deliver to him 1 share of stock in the Real Estate Company for every 2 shares held in Gendron.

The letter to the Gendron stockholders, written by its President, Vogel, set out the proposition with much detail. He said: "The opportunity is now presented to sell our stock collectively and as a whole at $75.00 per share and still retain the ownership of our real estate. * * *" He set out the provision for the incorporation of the Real Estate Company to take over the real estate and pointed out that of its 10,000 shares the stockholders were to be given 1 share for every 2 shares of their Gendron stock; and directed them, if the proposition met with their favor, to send their certificates to the Trustee endorsed in blank; after which American would go through with the deal and the Trustee would pay them.

More than 95% of the Gendron stock was deposited with the Trustee by November 8 and on that date the Gendron Board adopted a resolution noting that more than 95% of the stock had been deposited with the Trustee for sale and delivery to American at $75 per share; the incorporation of the realty company with an authorized capital of 10,000 no par shares; ratifying and approving the agreement of September 13 and directing the President and Secretary to execute a conveyance of its real estate to the realty company pursuant to paragraph 1 of the agreement, and to accept "the entire ten thousand (10,000) shares of Gendron Realty Company in full payment for said transfer, and that the stock so received shall be distributed to the present stockholders of the Gendron Wheel Company, one share for each two shares now held by said stockholders."

Up to this point, despite the early precaution of leaving a way open to purchase the Gendron assets, rather than its stock, it is clear that what was being engineered was a sale of the Gendron stock (apart from the real estate). The District Judge so found.

But on November 22, the Chief Examiner for the Federal Trade Commission wrote a letter to Gendron stating that, "Recent press reports indicate that your company is about to be sold to the American National Company," and requesting complete details of the transaction, including minutes of meetings of stockholders and directors at which the matter was discussed. When Mr. Taber received this letter he took it up with Paine & Hurd, Attorneys for Folds, Buck & Company.

He testified that Hurd said that the Bankers could not take American's notes (debentures) with the question of the Federal Trade Commission intervening. The objection was that the proposed acquisition of Gendron stock by American might be in violation of the Clayton Anti-Trust Act, 38 Stat. 730, 15 U.S.C.A. §§ 12–27, 44.

This created an emergency. American was obligated to pay to the Trustee $1,350,000 within thirty days from November 8, the date upon which more than 95% of the Gendron stock had been deposited, or forfeit the $150,000 it had on deposit. The time was too short, according to Taber, who was also attorney for Gendron, to give notice for a Gendron stockholders' meeting to consider the situation.

Taber testified that in this crisis Hurd suggested that Gendron stock be issued "equal to the total amount of The Gendron Wheel Company capital 2000 (sic) shares" to certain parties and that they could vote the sale of the assets and that the deal could then go through. These "certain parties" to whom this stock was to be issued were Diemer, President of American and a stockholder in Gendron; Vogel, President and a director of Gendron; Coover, a stockholder and Secretary-Treasurer of Gendron; Walter Diemer and William Booker, stockholders and directors of American; and Taber, himself, a stockholder and director of American and attorney for Gendron.

Taber testified that he took the matter up with Diemer, President of American, and it was agreed that the deal might go through that way; that on the 7th of December there was issued to these seven men stock "equal to the total amount of the Gendron Wheel Company capital, 2000 shares." But the deal did not "go through" that way. Gendron's entire authorized capital stock had already issued and all of it less 4 shares was then on deposit with the Trustee, and any further issue would be an overissue. Any attempt by these seven men, as holders of such unwarranted stock, to sell the assets of Gendron would have been usurpation and their action void. Appellee admits this in its brief. Confronted with this situation these seven men did hold a meeting on December 7, as Mr. Taber said they did, but in an entirely different setting, provided by a meeting of American's Board on December 5.

At this meeting the American Board passed a resolution authorizing the President and Secretary to enter into a lease between Gendron and American covering the real estate of Gendron. This confirmed the proposal for such lease contained in Vogel's letter to the Gendron stockholders. The American Board adopted a second resolution, containing a preamble as follows:

"Whereas, under the contract heretofore entered into by this corporation for the acquisition of at least 95% of the capital stock of The Gendron Wheel Company, the holders of all of the stock of The Gendron Wheel Company have elected to sell their stock under said contract and have deposited the same with The Ohio Savings Bank and Trust Company accordingly; * * *".

This was a clear statement of what the contract between Gendron stockholders and American was, in American's own minutes.

The resolution proceeded:

"1. That *immediately upon the acquisition by this corporation of the shares of stock of* * * * Gendron * * * *the President of this corporation shall* * * * *cause all of said shares of stock to be transferred into the names of such persons as said President may select,* and that the persons *to whose names the said stock shall be so transferred* shall be, and they are hereby, authorized and directed to waive notice of a meeting of the stockholders of * * * Gendron * * * to be held forthwith * * * *to vote all of said stock in favor of reducing the number of directors* of said corporation from * * * 9 * * * to 7 * * * and amending the regulations of said corporation accordingly, in favor of accepting the resignations of such directors which may be presented * * * and *upon the election of directors to fill any vacancies thereby created, and in favor of transferring and conveying to this corporation all of the property and assets* of every kind and character. * * *" (Italics ours.)

Section 2 of the resolution directed that the corporation should take over the assets and that its officers should take the steps necessary to consummate the acquisition. Following this action by the American Board these same seven men met in a "special meeting of the stockholders of Gendron" on December 7 but they did not assume to act under the invalid stock issue suggested by Hurd. They assumed that at that time American had become the sole

stockholder of Gendron and they acted as appointees and representatives of American as such sole stockholder as provided by Paragraph I of the resolution above quoted.

The minutes of this meeting record that the President, Mr. Vogel, stated "that pursuant to the contract heretofore entered into, the American National Company had acquired all of the capital stock of The Gendron Wheel Company and had caused the shares of said stock to be transferred into the names of the persons present at this meeting; that the American National Company desired to take over the entire property and assets of this corporation and had directed the persons in whose names the shares of stock of this corporation now stand to vote in favor of such action." The minutes listed Wm. L. Diemer as voting 19,994 shares and the others 1 share each. Certain resignations from the Board were accepted and the by-laws amended to reduce the Board to seven. The four who were already directors of Gendron continued in office and the other three were elected directors. The minutes then record that these stockholders by a total affirmative vote then adopted the following preamble and resolution:

"Whereas, The American National Company has acquired all or substantially all of the outstanding capital stock of this corporation and desires that all of the property and assets of this corporation shall be transferred to it;

"Now, Therefore, Be It Resolved by the stockholders of The Gendron Wheel Company that this corporation shall transfer and convey, and the President or a Vice-President and the Secretary or an Assistant Secretary of this corporation, be and they are hereby authorized in its name and behalf and under its corporate seal to execute, acknowledge and deliver suitable and proper instruments transferring and conveying, to The American National Company each and all of the property and assets of this corporation of every kind and character, subject to its outstanding liabilities which The American National Company shall assume; and that as soon as practicable proper steps shall be taken to dissolve this corporation or to reduce its capital stock to a nominal amount."

(All resolutions were prepared by Paine & Hurd and seem to have eventually satisfied the Federal Trade Commission.)

Immediately upon adjournment of this stockholders' meeting the newly constituted Board, these same seven men, met and adopted a resolution in accordance with that adopted by the stockholders directing its President and Secretary to make the transfers and on the same day Vogel and Coover, President and Secretary respectively of Gendron, executed an instrument in all respects appearing to be a bill of sale of all personal property and assets of Gendron to American. This transfer recites a consideration of $1 and other good and valuable considerations in hand paid. Appellee claims that this instrument constituted an outright sale of its assets upon which it sustained a deductible loss.

In such a situation it cannot, and we understand it does not, challenge the validity of the instrument itself, for if it was invalid, appellee's claim for losses fails to the ground. It must recognize the authority of American to direct the execution of the instrument *as sole stockholder of Gendron*. But American became the sole stockholder through its purchase of the shares then on deposit with the Trustee. It paid the Trustee $1,350,000, the balance of the purchase price on December 8, and out of the entire fund the Trustee paid the respective vendors at the rate of $75 per share, according to the contract. American paid Gendron nothing. The proof is that the Trustee never cancelled the deposited certificates or transferred them to American on the books of Gendron but delivered them to Gendron and took its receipt therefor. But none of these formalities affected the title of American to the stock which it bought and paid for.

It was the duty of appellee to show that the transfer of the assets by it to American on December 7 was a sale which resulted in the loss for which it claimed deduction. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991. We do not think that it has sustained this burden. Upon the contrary, we think that this instrument more nearly represents a distribution of assets by a corporation to its sole stockholder upon which no loss accrued.

The case is distinguishable from that of Commissioner v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588, this day decided. It was undisputed that the Swiss Oil Corporation, one of the constituents of Ash-

land, purchased the stock of the Union Company, but Ashland's position was that the acquisition of the stock of the Union Company and the liquidation of that Company were successive steps in a unitary plan to acquire the properties of the Union Company. We held that this was true and that no taxable gain upon the transaction was realized.

The factual situation here is entirely different.

Appellee here does not rely upon any such unitary plan. It makes no insistence that American ever purchased the Gendron stock. Its contention is directly to the contrary. In appellee's brief it is stated that: "The evidence establishes that the American Company purchased the personal assets of the Gendron Company and that the capital stock of the Gendron Company was not sold, transferred or delivered to the American Company. The American Company at no time was a stockholder of the Gendron Company." Appellee relies upon the bill of sale of December 7, 1927, as evidence of the sale of its property to American and upon this alone. It is manifest that upon essential features, the determinative facts of the two cases have little in common.

The judgment is reversed and the case remanded for a new trial.

HEALY, Circuit Judge, dissenting.