JUAN RAMOS BADILLO, apelante y apelado, *v.* SOL LUIS DESCARTES, SECRETARIO DEL TESORO, apelado y apelante.

Número 10793.

*Sometido:* 26 de enero de 1953. *Resuelto:* 8 de julio de 1954.

*Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del apelante; *Manuel A. García Méndez, J. B. García Méndez* y *Juan A. Faría,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El Secretario de Hacienda le notificó al contribuyente señor Juan Ramos Badillo ciertas deficiencias relacionadas con sus declaraciones de ingresos de los años 1940, 1942 y 1944. Después de las correspondientes vistas administrativas, y es-

tipulaciones sobre algunas de las partidas impugnadas durante la apelación ante el anterior Tribunal de Contribuciones de Puerto Rico, el caso ha quedado reducido a determinar la posible ganancia obtenida por el contribuyente, en virtud de un procedimiento de expropiación.

Los hechos jurídicos que deben servirnos de base para el estudio del presente caso, son los siguientes: en mayo del 1939, ciertos agrimensores de la rama federal de nuestro Gobierno, empezaron a medir una finca del contribuyente de noventa y tantas cuerdas, ubicada dentro de una porción de alrededor de 1500 cuerdas, que interesaba adquirir el Gobierno de los Estados Unidos, para el establecimiento de una base militar en la ciudad de Aguadilla, Puerto Rico, (t8 y 93). En mayo de 1939, el contribuyente tenía la propiedad que le fué expropiada cuatro meses más tarde, dedicada a los siguientes usos y servicios: (1) siembra de cañas (t7), (2) siembra de cocos (t39), (3) siembra de "coollo" (t39), (4) siembra de frutos menores (t40), (5) cría de animales (t7), (6) tienda de mercaderías secas (mercería), (t7), (7) almacén de provisiones para vender al por mayor y al detall (t7), (8) casa de residencia (t7) y (9) dos casitas para arrendamiento (t7).

Cuando ya era inminente la expropiación de su única finca, el contribuyente empezó a buscar otra finca rústica donde trasladar su cuota de caña, sus animales y continuar sus sembradíos de frutos menores y a buscar algunos locales donde trasladar sus negocios mercantiles y su residencia. No era fácil conseguir ni fincas ni locales de negocio (t15) y (t24). "Después de las expropiaciones quedaron los agricultores atravesando una situación muy seria . . . antes cada cual tenía su finquita . . . después las cosas cambiaron, se puso todo muy difícil" (t15) ya que "expropiaron 1500 cuerdas de terreno" (t16); el contribuyente tuvo que coger en alquiler dos casas de Edwin Hernández, un vecino, para acomodar temporalmente las existencias de provisiones, ya

que en los "pueblos pequeños no es fácil conseguir locales amplios" (t24).

El día 26 de julio de 1939, o sea, cuarenta y dos días antes de radicarse el procedimiento federal de expropiación, compró una finca de 32 cuerdas y 80 céntimos por $3,500, (t68–74), a donde traslada su cuota de caña, su ganado y reanuda su siembra de frutos menores, (t40).

El día 6 de septiembre de 1939, el Gobierno de los Estados Unidos de América radicó en la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, un procedimiento de expropiación contra 1877.39 cuerdas de terreno situadas en el Barrio Malezas Altas de Aguadilla, Puerto Rico, (t94). Después de radicarse la declaración de posesión por el Secretario de la Guerra de los Estados Unidos, en el mismo mes de septiembre se le notifica al contribuyente que debe desalojar la finca dentro de los próximos veinte días. Por último se le conceden nueve o diez días más para el desalojo, (t24), los cuales vencen alrededor del 6 de octubre de 1939.

El día 13 de noviembre de 1939, o sea, treinta y ocho días después del desalojo de su finca, el contribuyente compró una casa de madera, techada de zinc, en un solar de diez y medio metros de frente por quince y medio metros de fondo, ubicada en la Calle La Paz de Aguadilla por $1,800 (t74–77), donde se muda temporalmente (t17) y cuando se muda a la planta alta del local construído para la mercería, la pone a rentar (t22).

El día 21 de marzo de 1940, o sea, cinco meses y días después de la orden de desalojo, el contribuyente compra un solar de ciento treinta y ocho metros con cincuenta centímetros cuadrados en la Calle Stahl de Aguadilla por $1,315.75, (t79–82), con el propósito de fabricar el almacén de provisiones, (t19) el cual no llega a fabricar porque consigue un solar más cerca, por lo cual decide fabricar en el primer local adquirido una casa de alquiler (t21).

El día 20 de junio de 1940, o sea, ocho meses y días después de la orden de desalojo, el contribuyente compra un solar de

trescientos cuarenta y dos metros cuadrados con veintidós centésimas de metro cuadrado, en la Calle Stahl de Aguadilla por $1,368.88, (t87–90) con el propósito de fabricar un local para su negocio de mercancías secas en la planta baja y una vivienda para él y su familia en la planta alta, (t35), local y vivienda que ocupa a la fecha en que el caso se ventila en el Tribunal de Contribuciones de Puerto Rico. El Secretario de Hacienda admite que en la construcción de esta edificación el contribuyente gastó $11,726.76 en alguna fecha entre los años 1941 y 1942.

El día 2 de julio de 1940, el contribuyente recibió el primer pago de su propiedad expropiada, un cheque del tribunal federal por la cantidad de $20,075.24, (t24).

El día 21 de agosto de 1940, o sea, diez meses y días después de la orden de desalojo y cincuenta días después del primer recibo de dinero, el contribuyente compra una casa de madera, con otra casa pequeña también de madera, en un solar de cinco metros diez centímetros de frente por veintisiete metros treinta y cinco centímetros de fondo, en la calle Stahl de Aguadilla, por $1,000, (t84–86) con el propósito de construir un almacén de provisiones, y el cual ya está construído en la fecha en que el caso se ventila en el Tribunal de Contribuciones. El día 16 de febrero de 1942, después de la litigación correspondiente sobre el valor real de la propiedad expropiada, el contribuyente recibe un segundo y último pago, mediante un cheque del tribunal federal por la cantidad de $13,060.78, (t94).

Una comparación de las propiedades que el contribuyente tenía cuando se le expropia, a saber, (1) una finca, (2) un almacén de provisiones, (3) una mercería, (4) una residencia y dos casas de arrendamiento, y de las nuevas propiedades que el contribuyente tiene cuando se le investiga en el 1949, a saber, (1) una finca, (2) un almacén de provisiones, (3) una mercería con vivienda en la planta alta, (4) dos casas de alquiler, una de dos plantas, demuestra que las nuevas propie-

dades adquiridas todas están conectadas con el uso o el servicio de las primeras propiedades expropiadas.

El Secretario de Hacienda admite asimismo, tanto en su notificación de deficiencia como durante la vista del caso, que de las dos cantidades recibidas por el contribuyente, deben deducirse, por no representar ganancia alguna las siguientes partidas: $4,213.35, que representa el costo de las plantaciones destruídas, (L6) y (t25), por tratarse de un reintegro representado por el pago de las siembras, $1,211.95 que le pagó a un medianero de apellido Acevedo, por sus derechos sobre la finca expropiada. En cuanto a la partida de honorarios al licenciado Juan Bautista García Méndez, no hubo prueba directa, pero durante la vista de la moción de reconsideración, el Secretario de Hacienda anunció estar conforme en rebajar del cómputo "dos mil y pico de dólares" (transcripción de la vista en reconsideración, página 6) y durante toda la discusión del caso el contribuyente alega que debe deducirse una partida de honorarios de abogado de $2,079.38. De todos modos, tal partida no resulta irrazonable ni especulativa, bien se considere como pago de todo el procedimiento, o pago del aumento conseguido sobre el estimado inicial de la valoración, y no vemos razón por la cual deba rechazarse en el nuevo cómputo.

La prueba presentada puede resumirse en el siguiente análisis matemático:

Cantidades recibidas como precio de expropiación:

| | |
|---|---|
| Julio 2 de 1940 | $20,075.24 |
| Febrero 16 de 1942 | 13,060.78 |
| Total | $33,136.02 |

Deducciones:

| | | |
|---|---|---|
| Costo de las siembras | $4,213.35 | |
| Pagado al medianero Acevedo | 1,211.95 | |
| Honorarios de Abogado | 2,079.28 | |
| Total deducciones | | $7,504.58 |
| Total a reinvertir | | 25,631.44 |

Montante de reinversiones:

| | |
|---|---:|
| Finca de 32.80 cuerdas compradas el 26 de julio de 1939 ............ | $3, 500. 00 |
| Casa de madera y solar de la Calle Paz comprada el 13 de noviembre de 1939 ..................... | 1, 800. 00 |
| Solar en la calle Stahl comprado el 21 de marzo de 1940 ............. | 1, 315. 75 |
| Solar en la calle Stahl comprado el 20 de junio de 1940 ............. | 1, 368. 88 |
| Solar en la calle Stahl comprado el 21 de agosto de 1940 ............. | 1, 000. 00 |
| Costo del edificio sobre el solar comprado el 20 de junio de 1940 .... | 11, 726. 76 |
| Total de las reinversiones | $20, 711. 39 |

Dinero recibido y no invertido................... $4, 920. 05

En el análisis matemático que precede, hemos empleado el método práctico sugerido por la jurisprudencia en el sentido: (1) que cualquiera ganancia no reinvertida en la adquisición de nuevas propiedades o en el establecimiento de un fondo de reposición, será tributable y (2) que para determinar la ganancia tributable, la cuestión litigiosa debe considerarse en su totalidad, para ver si la transacción o transacciones envueltas cumplen con las normas del estatuto: *Francis V. Dupont et al v. Commissioner of Internal Revenue*, 31 BTA 278; (Arundell), (1934), cita precisa a la pág. 282; *Commissioner of Internal Revenue v. Ashland Oil & Refining Co.*, 99 F.2d 588 (Simons), (1938), cita precisa a la pág. 591; *Sneed v. Jones*, 103 F. Supp. 802, (Vaught), (1952), cita precisa a la pág. 805.

En su sentencia de 15 de mayo de 1952, el anterior Tribunal de Contribuciones de Puerto Rico llegó a la conclusión, que la deficiencia impuesta por el Tesorero correspondiente al año 1940 era insostenible, ya que la transacción que dió origen a cualquiera ganancia capital tributable, en manos del contribuyente, se efectuó en septiembre de 1939, porque

en esa fecha el título de dominio de la propiedad del demandante pasó a los Estados Unidos de América sin sujeción a condición alguna, y a partir de esa fecha, el contribuyente fué dueño y tenía a su disposición la compensación justa de $20,075.24 depositada por el Gobierno de los Estados Unidos; que el hecho que el contribuyente no retirara la compensación hasta julio de 1940 no alteraba la situación de derecho anteriormente descrita, debiéndose concluir, que si el contribuyente realizó alguna ganancia capital como consecuencia de la expropiación mencionada, a base de la compensación inicial depositada, dicha ganancia la realizó en el año 1939 y no en el año 1940. En cuanto a la ganancia para el año 1942, la situación resultaba distinta, ya que la compensación adicional de $13,060.78, con toda probabilidad, fué el resultado de la litigación del caso de expropiación, la fijación judicial de una justa compensación, de manera que no podría decirse que estuvo a disposición del contribuyente, sino a partir de la fecha en que el tribunal la decretó, o sea, desde febrero 16, 1942. No existiendo prueba de que con esta compensación adicional de $13,060.78 el contribuyente adquiriera propiedad alguna relacionada con el uso o servicio de la finca expropiada, ni que se solicitara el establecimiento de un fondo de reposición, se debía sostener la ganancia capital imputada por el Tesorero para el año 1942.

De la parte de la sentencia que niega la imposición de ganancia para el año 1940, apela del Secretario de Hacienda, y de la parte de la sentencia que reconoce la imposición de ganancia para el año 1942, apela el contribuyente. La objeción del Secretario de Hacienda podría presentarse de la manera siguiente: "es requisito indispensable que el dinero utilizado para la compra de propiedad similar, sea el proveniente de la expropiación, o por lo menos, que se pueda trazar (*trace*) al fondo de la expropiación; sosteniendo este principio, es doctrina establecida que el contribuyente *no puede con anterioridad a la expropiación, adquirir con su propio peculio propiedad similar*, y luego solicitar los beneficios de

la sec. 6 (*b*) (5), cuando reciba el importe de la expropiación" (alegato, páginas 5-6). La objeción del contribuyente podría presentarse de la manera siguiente: "el contribuyente tenía derecho a invertir dinero anticipadamente, dentro de los hechos excepcionales de este caso, en la adquisición de propiedades similares en uso y servicio con las expropiadas" (primer error); en cuanto a la imposición de ganancias para el año 1942, "el tribunal recurrido cometió error al resolver que no hubo prueba que la cantidad de $13,060.78 fuera gastada por el contribuyente en propiedad alguna, similar o no similar en uso a los bienes expropiados."

■■■ La ley envuelta en este caso es la sec. 6 (*b*) (5) de la Ley de Contribuciones sobre Ingresos de 1924 (Leyes de 1925, pág. 401) que dispone:

"Si la propiedad (como resultado de su destrucción en todo o en parte, de robo o confiscación o del ejercicio del poder de requisición *o expropiación forzosa, o del peligro inminente de ello*) fuere compulsoria o involuntariamente convertida en propiedad similar, o relacionada en servicio o en uso con la propiedad de ese modo convertida, *o en dinero efectivo que se gastare inmediatamente y de buena fe,* de acuerdo con el reglamento prescrito por el Tesorero, *en la* adquisición de otra propiedad similar o relacionada en servicio o uso con la propiedad así convertida, o en la adquisición del dominio de una corporación dueña de esa otra propiedad, o en el establecimiento de un fondo de reposición, no se reconocerá ganancia o pérdida alguna. *Si parte del dinero no fuere de ese modo invertido,* la ganancia si la hubiere, será reconocida, *pero en cantidad que no excederá del dinero que no se* invirtiere en ese modo;"

relacionada con el art. 30 del Reglamento núm. uno de 6 de agosto de 1925 del anterior Tesorero de Puerto Rico, que dispone:

"La sección 6 (*b*) (5) trata de aquellos casos en que la propiedad es compulsoria o involuntariamente convertida en propiedad similar o en dinero en efectivo como resultado de un fuego, naufragio, robo, *expropiación forzosa,* u otras causas similares enumeradas en el estatuto. Si la propiedad así destruída, ro-

bada, confiscada o expropiada, es reemplazada en su género por propiedad similar o propiedad relacionada en servicio o uso, no se reconocerá ganancia o pérdida alguna: sin embargo, si la propiedad anterior *es compulsoria o involuntariamente convertida en dinero en efectivo,* tal ganancia o pérdida será reconocida, *a menos que dicho dinero se gaste inmediatamente,* bajo las reglas prescritas por el Tesorero, con la aprobación del Gobernador, en cualesquiera de las siguientes formas: (1) en la adquisición de otra propiedad similar *o relacicnada en servicio o uso con la propiedad así convertida,* (2) en la adquisición del control de una corporación dueña de esa otra propiedad, o (3), en el establecimiento de un fondo de reposición . . . . Si alguna parte del dinero no se gastare en la forma antedicha, la ganancia si alguna hubiere, será reconocida, *pero en una cantidad que no exceda la del dinero no gastado . . .*

Como en este caso no se trata de una permuta de una propiedad por otra similar, como sucede con alguna frecuencia cuando la conversión se realiza entre asegurador y asegurado, y sí de una propiedad convertida en dinero en metálico, tanto la sec. 6 (*b*) (5) de la ley como el art. 30 del reglamento establecen la norma *que el dinero en efectivo se gaste inmediatamente y de buena fe, en la adquisición de otra propiedad similar o relacionada en servicio o uso con la propiedad así convertida, o en el establecimiento de un fondo de reposición,* y si parte del dinero no fuere de ese modo invertido, será reconocida una ganancia, pero la misma no excederá aquella parte del dinero que no hubiese sido invertido.

La teoría general que rige la cuestión litigiosa es que la conversión involuntaria de una propiedad puede forzar al contribuyente a realizar una ganancia que tal vez él no desee, y por lo tanto, la imposición de dicha ganancia debe ser diferida hasta un tiempo razonable, durante el cual, el contribuyente pueda reinvertir dicha ganancia en una propiedad similar o relacionada con el uso o servicio de la anterior propiedad: *Herder* v. *Helvering,* 106 F.2d 153, (Vinson), (1939), cita precisa a la pág. 160; *Francis V. Dupont et al.,*

v. *Commissioner of Internal Revenue,* supra, cita precisa a la pág. 281.

 La jurisprudencia ha ido esclareciéndo, poco a poco, cada uno de los conceptos comprendidos en la norma. El concepto "inmediatamente" *(forthwith)* se ha interpretado como que significa "tan pronto como por un esfuerzo razonable, de acuerdo con el propósito perseguido, pueda ser cumplido:" *Paul Haberland* v. *Commissioner of Internal Revenue,* 25 B.T.A. 1370, (Arundell), (1932), cita precisa a la pág. 1379, (tiempo considerado como razonable, desde octubre de 1921 hasta noviembre 1, 1922) ; *August Buckhardt* v. *Commissioner of Internal Revenue,* 32 B.T.A. 1272, (Arundell), (1935), (tiempo considerado como razonable, desde el 26 de marzo de 1931 hasta los primeros meses del 1933) ; *In re Goodman's Estate,* 199 F.2d 895, (Staley), (1952), (tiempo considerado como razonable, 15 meses). El concepto "buena fe" se ha interpretado en el sentido que el propósito de la alegada reinversión no sea para defraudar al tesoro de sus legítimos ingrésos; *August Buckhardt* v. *Commissioner of Internal Revenue,* supra, cita precisa a la pág. 1277. El concepto "otra propiedad similar o relacionada en servicio con la propiedad así convertida" se ha interpretado en el sentido que las nuevas propiedades adquiridas desempeñen igual función, dentro del negocio del contribuyente, que las propiedades anteriores: *Lynchburg National Bank & Trust Co.* v. *Commissioner of Internal Revenue,* 208 F.2d 757, (Soper), (1953) ; cita precisa a la pág. 758. También se ha resuelto que el contribuyente no tiene que pedir el establecimiento de un fondo de reposición, a menos que no sea evidente la imposibilidad de reinvertir el dinero en metálico dentro de un tiempo razonable: *August Buckhardt* v. *Commissioner of Internal Revenue,* supra, cita precisa a la pag. 1277.

 Resumiendo, en cualquier caso que se trate de una propiedad compulsoria o involuntariamente convertida en dinero en efectivo, baste que el contribuyente pruebe: (1) que

las propiedades adquiridas con antelación al recibo del dinero las adquirió en peligro inminente de expropiación, dentro de un tiempo razonable de acuerdo con la inminencia o amenaza de la expropiación, y que las propiedades adquiridas después de recibir el dinero, las adquirió dentro de un tiempo razonable, de acuerdo con la naturaleza de la transacción o el objeto convertido utilizando para tal fin los fondos recibidos; (2) que las adquirió de buena fe, o sea, sin propósito de evadir la tributación sobre la ganancia; y (3) que las nuevas propiedades desempeñan igual función (uso similar o relacionado) que las que desempeñaban sus anteriores propiedades, para que tenga derecho a pedir que no se le reconozca ganancia alguna por la conversión de su propiedad, aunque no haya solicitado un fondo de reposición. Su obligación para solicitar tal fondo de reposición nace, cuando no sea posible reinvertir dentro de un tiempo razonable, calculado de acuerdo con las circunstancias de cada caso, el dinero en metálico que reciba por la propiedad convertida.

Sin embargo la objeción del Secretario de Hacienda, por lo menos en cuanto a la ganancia no reconocida durante el año 1940 por el anterior Tribunal de Contribuciones de Puerto Rico, es que siendo requisito indispensable que el dinero utilizado para la compra de nuevas propiedades sea el proveniente de la expropiación, y que se pueda trazar como tal, el contribuyente no podía con anterioridad a la expropiación, adquirir con su propio peculio, ninguna propiedad similar, para luego solicitar los beneficios de la sec. 6 (b) (5), cuando recibiera el importe de la compensación.

Para sostener su punto de vista hace referencia al Reglamento núm. 111 del Secretario del Tesoro de Estados Unidos, sección 112 (f) (1), que dispone:

"A fin de que pueda aprovecharse de los beneficios de la sección 112 (f), [equivalente a nuestra sec. 6 (b) (5)], no es suficiente que el contribuyente demuestre que subsiguientemente al recibo del dinero adjudicado por expropiación él compró otra propiedad similar o relacionada con el uso. El contribuyente

tiene que demostrar que el dinero con el ·cual pagó la propiedad así comprada proviene del producto de la adjudicación [el texto inglés dice: 'the taxpayer must trace the proceeds of the award into the payments for the property so purchased']. No es necesario que el dinero haya sido separado (*earmarked*) para tal fin, pero el contribuyente tiene el deber de ·probar que el mismo fué realmente reinvertido en dicha otra propiedad similar ·o relacionada en uso con la propiedad convertida." (Corchetes ·nuestros.)

Es bueno recordar que nuestro reglamento estadual no im-·pone al contribuyente la obligación de trazar el origen del rédito (*to trace the proceeds*). Pero siendo la sec. 6(*b*) (5) de nuestra Ley núm. 74 de 6 de agosto de 1925 igual a la sec. 203(*b*) (5) de la Ley Pública núm. 176 de 2 de junio de 1924 del sexagésimo octavo Congreso, 43 Stat. 253, cabe la conjetura que en la misma medida que el reglamento federal no es contrario a la ley federal, se debe considerar formando parte de nuestra ley. estadual, una disposición semejante, aunque no haya sido objeto de reglamentación específica.

Ahora bien, lo que el contribuyente alega y prueba es que las inversiones por él realizadas fueron hechas ante un peligro inminente de expropiación, y antes de recibir el montante de su participación en la expropiación en bloque de las mil quinientas cuerdas que se realiza en este caso, con excepción de dos propiedades que consideraremos separadamente, por lo cual él no podría demostrar que el dinero utilizado provenía del rédito de la expropiación. La prueba demuestra que no se trata de un rumor o una vaga especulación del contribuyente sobre el peligro de expropiación, sino de un peligro inminente de expropiación tal y.como la concibe nuestro propio estatuto, o sea, un peligro inminente de expropiación que se resuelve en definitiva, en una expropiación real de las anteriores propiedades. Esto distingue el presente caso de lo resuelto por nosotros en *Santiago* v. *Tribunal de Contribuciones*, 71 D.P.R. 735 (De Jesús), (1950), cita precisa a la pág. 739. Es indudable que nuestra sec. 6 (*b*) (5) no reconoce ganancia cuando la reinversión se hace en peligro inminente

de expropiación. No es difícil concluir que tampoco reconocería ganancia alguna cuando la reinversión se haga, en propiedades relacionadas en uso o servicio con las anteriores propiedades, antes de recibirse el dinero de la expropiación. Si aplicáramos la regla que sólo en aquellos casos donde las reinversiones se hagan con el dinero recibido de la expropiación, es que no se reconocería ganancia, quedaría defraudada la intención legislativa de no reconocer ganancia cuando las reinversiones se hagan en peligro inminente de expropiación y antes de recibirse el dinero de la expropiación: 3 Merten's *Law of Federal Income Taxation* 342, (Ed. de Gallaghan and Company), (1942).

Además no debemos darle a la frase "demostrar el origen del rédito" (*to trace the proceeds*) un contenido mágico, que puede subsistir por sí mismo, sin necesidad de apoyarse en la realidad de las cosas o en los principios lógicos del razonamiento. Lo que ha querido evitar el estatuto es que propiedades adquiridas antes o después de la expropiación, en el curso normal de los negocios, que no tienen nada que ver con la reinversión forzada o la ganancia involuntaria que crea una expropiación, puedan ser incluídas dentro de la mecánica de la evasión de contribuciones. La proposición adelantada por el Secretario de Hacienda fué tan duramente criticada por los comentaristas y jueces norteamericanos, que en el 1951 el Congreso de los Estados Unidos la abolió legislativamente: *Stanley* v. *Kilcullen: The Federal Income Tax*, pág. 187, (Ed. de *The Tax Club Press* (1951); 65 Stat. 733, cita precisa a la pág. 734, 26 U.C.S.A., sec. 112, Suplemento anual correspondiente al año 1954, pág. 39). Tenemos entendido que también ha sido eliminada por la nueva ley de contribuciones sobre ingresos preparada por nuestra propia Legislatura. Véase además *Francis V. Dupont et al.*, 31 B.T.A. 278, (Arundell), (1934), cita precisa a la pág. 280, en cuanto a dinero tomado a préstamo ante un peligro inminente de expropiación. *Bandes* v. *Commissioner of Internal Revenue*, 69 F.2d 812 (Swan), (1934), cita precisa a la pág. 813, en

cuanto a dinero tomado a préstamo con anticipación al recibo del rédito de la adjudicación; *Sneed* v. *Jones*, supra, cita precisa a la pág. 806 en cuanto a dinero tomado a préstamo con anticipación a la transacción de una expropiación.

En cuanto a las dos propiedades adquiridas después de recibir el rédito de la expropiación, un solar en la calle Stahl de Aguadilla, Puerto Rico (t81–85) y la construcción de un edificio en el otro solar de la Calle Stahl, a un costo admitido por el Secretario de Hacienda de $11,726.76, creemos que el origen del rédito fué establecido. El contribuyente declaró que entregó los cheques, los planos, las escrituras, todo lo que tenía en su poder, a un empleado del negociado de Contribuciones sobre Ingresos; que allí se extraviaron y no han podido devolvérselos (t32–33), hecho no desmentido por el Secretario de Hacienda; que los pagos fueron hechos de la cuenta número dos, una cuenta aparte donde él había depositado cuanto había recibido del Gobierno, (t32).

El análisis de los hechos del presente caso nos satisface, en cuanto a que, las propiedades compradas por el contribuyente desde el 26 de julio de 1939 hasta el 21 de agosto de 1940, fueron todas adquiridas dentro de un tiempo razonable, de acuerdo con la situación de emergencia creada por la expropiación de unas 1500 cuerdas de terreno en la zona rural y de la falta de locales comerciales, que obligó al contribuyente a edificar sus propios locales de comercio; que dichas propiedades fueron adquiridas por el contribuyente de buena fe, dentro de la situación de emergencia que en sus negocios creara la expropiación de la finca donde tenía establecidos tanto sus sembradíos como sus locales de mercadería húmeda, mercadería seca, casa de residencia, casas de alquiler; que las nuevas propiedades adquiridas o construídas por el contribuyente todas están relacionadas con el uso, servicio o funcionamiento de las propiedades anteriores del contribuyente; que la única propiedad que adquirió antes de iniciarse el procedimiento de expropiación, una finca rústica, la adquirió ante el peligro inminente de expropiación, para trasladar su cuota

de caña, su ganado y empezar sus nuevas siembras; que las propiedades adquiridas después de iniciada la expropiación, pero antes de recibir el dinero de la misma, las adquirió para evitar la paralización de sus negocios de mercaderías secas y de mercaderías húmedas, para conseguir una residencia para su familia y para reemplazar las casas de alquiler que tenía en la finca expropiada; que las únicas reinversiones que realizó después de recibir el dinero de la expropiación fué para comprar una casa y construir un local para su negocio de mercaderías secas y para residencia de su familia, todo lo cual está relacionado con el uso o servicio o función de las propiedades que le fueron expropiadas, pudiendo trazarse el origen del rédito en ambas reinversiones; que examinada en su totalidad la conversión, la misma no debe arrojar otra ganancia que la diferencia que exista entre el total de las cantidades recibidas por el contribuyente,—descontando los gastos incurridos en la defensa de la valoración injusta y los reintegros reconocidos por ley—y el total de las cantidades reinvertidas de buena fe por el contribuyente para reemplazar los usos, servicios y funciones de las anteriores propiedades, tal como aparecen en el análisis matemático aquí incluído.

*Debe modificarse la sentencia recurrida de acuerdo con los términos de esta opinión y radicarse, en tiempo oportuno, nuevos cómputos de acuerdo con lo aquí resuelto.*